**UNITED STATES of America, Plaintiff,**

**v.**

**Bill McNEAL, Defendant.**

**No. 89CR379.**

United States District Court,
N.D.Ohio, E.D.

May 3, 1990.

Blas Serrano, Asst. U.S. Atty., Cleveland, Ohio, for plaintiff.

Rocco J. Russo, Cleveland, Ohio, for defendant.

MEMORANDUM OF OPINION

BATCHELDER, District Judge.

This matter is before the Court upon defendant's motions to suppress evidence

seized during the arrest of the defendant, for disclosure of the identity of the government's confidential informant, and for a bill of particulars. On April 20, 1990, an evidentiary hearing was held to determine the merits of the motions to suppress and for disclosure of the identity of the government informant. After review of the evidence presented, the briefs in support, the responses thereto, and the applicable law, the Court DENIES defendant's motions for the reasons set forth below.

## FACTS

Defendant is charged with two counts of possessing with the intent to distribute within 1000 feet of an elementary school a large amount of cocaine and cocaine base in violation of 21 U.S.C. §§ 841(a)(1), and 845a, and one count of possessing a firearm during and in relation to the commission of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1).

At the evidentiary hearing, the following facts were adduced. On December 5, 1989, United States Postal Inspector Paul Hartman and several other members of the Street Gang Task Force, a multi-jurisdictional police unit formed to combat street gang violence and related crimes, were present at the King–Kennedy housing projects located on the east side of Cleveland at East 59th Street and Woodland Avenue. The King–Kennedy housing projects are notorious in Cleveland for being a center of drug trafficking and other violent crimes. On that particular day, as the officers were discussing information that had been received regarding drug trafficking activity in the projects, an informant approached and told the officers that a man named Bill, who was armed and dangerous, had transported drugs, with the intention of selling them, to apartment 104N in the "Greens" complex.[1] The informant did not tell the police how he came to know that the person named Bill was carrying drugs and a gun. Inspector Hartman credibly testified that this particular informant had provided reliable information on past occasions which had led to the recovery of drugs and weapons and several arrests. Inspector Hartman also testified that he saw a person peering out of the kitchen window from apartment 104N. Since the officers, some of whom were in uniform, were in plain sight of that window, Inspector Hartman believed that they had been spotted.

Shortly thereafter, Inspector Hartman and six officers of the Street Gang Task Force went to apartment 104N to secure it until a warrant could be obtained and to arrest the defendant. Inspector Hartman, placing himself flat against the wall next to the door of apartment 104N, extended his arm and knocked several times on the apartment door, identifying himself as a police officer. Tina Ward, the leaseholder of the apartment, eventually answered the door and the officers entered the apartment without her consent. Immediately upon the officer's entry, Ms. Ward asked whether the officers had a warrant to search the apartment, to which the officers replied that they did not need one at that time but that they would obtain one later.[2]

The officers, led by Inspector Hartman, executed a protective sweep of the apartment. Inspector Hartman testified that as he proceeded down a hallway, he saw an individual's shadow emanating from a bedroom.[3] As the inspector headed for that bedroom, he saw the door begin to close. Inspector Hartman drew his gun and entered the room where he found the defendant backing away from the door. The defendant, dressed in coveralls, with the zipper down about six inches, was holding a blue bag in his right hand. As he backed away from the inspector, the defendant transferred the bag from his right hand to his left and reached toward his left armpit

---

**1.** The King–Kennedy apartment complex is set up so that four apartment buildings surround a courtyard. Each of the four buildings has a different color for the apartment doors in that building, and the buildings are referred to by the residents by their door colors.

**2.** After the officers arrested the defendant, Ms. Ward knowingly and voluntarily signed a consent to a search form and, as a result, the warrant was not sought.

**3.** The Court notes the presence here of a true penumbral emanation.

for what the inspector believed to be a weapon. The inspector ordered the defendant to stop what he was doing, to place his hands on his head and to drop the blue bag. It was at this time that Inspector Hartman noticed a white plastic bag in the defendant's hand. Another officer came into the room to assist Hartman in securing the defendant, and as they turned him around to place his hands against the wall, the inspector noticed a bulge in the area of his left armpit under his coveralls. Together the officers searched the defendant, and recovered from beneath the coveralls under the left arm a loaded .45 caliber semi-automatic pistol. After seizing the weapon, the police arrested the defendant, advised him of his rights under the Constitution, and then completed their search of his person as well as the blue bag. They seized, among other things, $768, two small vials and a pager from the defendant's pockets, some $4,000 in a money belt around his waist, and a substantial amount of cocaine and cocaine base and some keys from the blue bag. Upon leaving the complex, the defendant stated to the officers that Tina Ward had nothing to do with this, that the defendant was in the apartment to use the phone, and that he did not stay there. Defendant offered an address on Van Buren as his residence and the name of Patricia Moore as the person who resided there with him.

After the arrest, the police learned that defendant lived somewhere other than apartment 104N and that one of the keys found in the blue bag opened the door to Tina Ward's apartment. The police did not find any of the defendant's clothing in the apartment. After the cross-examination of the inspector, the government offered its exhibits and rested.

Tina Ward testified on behalf of the defendant as to what occurred on December 5, 1989, and for the purpose of demonstrating that the defendant had a protectable Fourth Amendment interest in apartment 104N. The Court notes at the outset that, because of the inconsistencies between her testimony on the stand and what she told police on December 5 in a written statement, the way she changed her story in mid-sentence, the fact that, on December 5, 1989, she did not even know the defendant's last name and yet claimed that they had been lovers since September or October, and her demeanor generally on the stand, it does not find Tina Ward a credible witness. Apart from the facts that were corroborated by other witnesses, e.g., that the officers entered the apartment without her consent, that she asked whether they had a search warrant, and that there were others present in the apartment at the time, the Court accords no weight to Ms. Ward's testimony.[4] The defendant presented no other witnesses and then rested for the purpose of the motions.

While not expressly stated, the evidence at the hearing made it clear that the defendant challenges the validity of the search because of the initial allegedly illegal entry into apartment 104N. All evidence seized after that, the defendant contends, was "fruit of the poisonous tree."

## LEGAL ANALYSIS

■ On a motion to suppress, the defendant bears the initial burden of showing that he has a protectable Fourth Amendment interest in the places and things searched. *United States v. Sangineto–Miranda,* 859 F.2d 1501, 1510 (6th Cir.1988). "Since the decision in *Katz v. United States,* 389 U.S. 347 [88 S.Ct. 507, 19 L.Ed.2d 576] (1967), it has been the law that 'capacity to claim the protection of the Fourth Amendment depends ... upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.' *Rakas v. Illinois,* 439 U.S. 128, 143 [99 S.Ct. 421, 430, 58 L.Ed.2d 387] (1978). A subjective expectation of privacy is legit-

---

**4.** Ms. Ward testified that she and the defendant were lovers and that sometimes he would stay at her apartment from about noon until 4:00 a.m. According to Ward's testimony, the defendant left at 4:00 a.m. because if he had stayed longer, Ward would be in violation of King–Kennedy regulations. Even if the Court believed this story, which it does not, Ms. Ward did not testify that the defendant intended to spend that particular night at her apartment.

imate if it is ' "one that society is prepared to recognize as 'reasonable,' " ' *id.*, at 143–144, n. 12, 99 S.Ct. at 430–31, n. 12, quoting *Katz, supra,* [389 U.S.] at 361 [88 S.Ct. at 516] (Harlan, J., concurring.)" *Minnesota v. Olson,* —— U.S. ——, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).

Just two days before the instant hearing, the Supreme Court held that the defendant in *Olson,* who was an overnight guest at the searched premises, had an expectation of privacy that "society was prepared to recognize as reasonable" and therefore he had standing to challenge the alleged Fourth Amendment violations. In *Olson,* the Court stated, "[t]o hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share." —— U.S. at ——, 110 S.Ct. at 1689.

The Court in *Olson* relied heavily on two cases in reaching its decision. The Court remarked that the facts in *Olson* are remarkably similar to those in *Jones v. U.S.,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). —— U.S. at ——, 110 S.Ct. at 1687–89. In *Jones,* the petitioner was arrested in the apartment of a friend who had given him use of it while the friend was away on a trip. The petitioner had a key and some clothing and had stayed there "maybe a night." 362 U.S. at 259, 80 S.Ct. at 730. The Court, recognizing that Fourth Amendment rights are personal to the one asserting them and may not be asserted vicariously, held that Jones had standing to challenge the validity of the search because he was "legitimately on premises." *Id.* at 267, 80 S.Ct. at 734.

The second case on which the *Olson* Court relied was *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1979). *Rakas* involved the nonconsensual search of an automobile in which the defendants had been passengers. The Court in *Rakas* reviewed the holding in *Jones,* noting that the concept of standing in *Jones* focused on whether the person seeking to challenge the legality of the search was himself a "victim" of the search or seizure, and thus, the issue there was not so much a question

of standing as a question of whether one had had his own rights infringed by the challenged search or seizure. Because it found that standing and substantive Fourth Amendment rights, while theoretically separate, are clearly intertwined, the *Rakas* Court modified *Jones* by concluding that ". . . definition of [Fourth Amendment] rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." *Id.* at 140, 99 S.Ct. at 428.

The *Rakas* Court further modified *Jones* by concluding that the "legitimately on premises" test should be viewed in the context of whether the individual has had his own Fourth Amendment rights violated by the search. The Court limited the broad reach of that language to the facts of the *Jones* case, expressing grave concern that, taken literally, the "legitimately on premises" test might permit a casual visitor in the kitchen of a home to object to a search of the home's basement which he had never visited or seen, or might permit such a casual visitor, who came onto the premises a minute before a search of those premises and left immediately thereafter, to contest the legality of the search. The Court was not prepared in either of those instances to say that such a person had any legitimate expectation of privacy. *Id.* 439 U.S. at 142, 99 S.Ct. at 430. The *Rakas* Court, after careful review and analysis of "legitimately on premises" as a bright line rule, stated,

In abandoning "legitimately on premises" for the doctrine that we announce today, we are not forsaking a time-tested and workable rule, which has produced consistent results when applied, solely for the sake of fidelity to the values underlying the Fourth Amendment. Rather, we are rejecting blind adherence to a phrase which at most has superficial clarity and which conceals underneath that thin veneer all of the problems of line drawing which must be faced in any conscientious effort to apply the Fourth Amendment. Where the factual premises for a rule are so generally prevalent that little would be lost and much would be gained by abandoning case-by-case analysis, we have not hesitated to do so.

*See United States v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 476, 38 L.Ed.2d 427 (1973). But the phrase "legitimately on premises" has not been shown to be an easily applicable measure of Fourth Amendment rights so much as it has proved to be simply a label placed by the courts on results which have not been subjected to careful analysis. We would not wish to be understood as saying that legitimate presence on the premises is irrelevant to one's expectation of privacy, but it cannot be deemed controlling.

*Rakas v. Illinois,* 439 U.S. at 147–148, 99 S.Ct. at 432–433.

The *Olson* Court held that the mere status of an overnight guest is sufficient to establish a legitimate expectation of privacy in the home of the host. Most of Justice White's opinion in *Olson* is a rumination on the genteel traditions associated with having overnight guests, and a series of observations such as that the overnight guest is at his most vulnerable when he is asleep. Although the opinion interchanges the terms "overnight guest," "houseguest" and "guest," both "overnight guest" and "houseguest" definitionally require an overnight stay.[5] The entire thrust of the reasoning of the opinion is that persons one invites to share in the hospitality of one's home for a stay of at least a night's duration also share in the privacy of that home. This Court believes that despite some imprecision in the terminology, the holding in *Olson* is limited to overnight guests and should not be extended to someone who is nothing more than a casual visitor who is there to use the phone.[6] The facts as ad-

duced at the hearing in the case before this Court establish that defendant McNeal was not an overnight guest. Accordingly, he does not come within the purview and holding of *Minnesota v. Olson.*

■ The issue that remains to be decided is whether the defendant in this case had any legitimate expectation of privacy in Tina Ward's apartment whatsoever on the night in question. While the defendant did have a key to the apartment, he also had keys to other apartments in the complex in which he did not live. He had no clothes, no toothbrush, nothing on his person or in the apartment that would indicate that he intended to spend the night in question in Ward's apartment, nothing that would indicate that he was more than a casual, transient visitor on that night. This Court finds that the facts adduced at the hearing reveal that the defendant himself had no subjective expectation of privacy in the apartment, having stated that he was merely there to use the phone, and that, even if he had, his was not one of those "expectations of privacy which we all share," *Olson,* — U.S. at —, 110 S.Ct. at 1689. Society is not prepared to recognize the expectation of privacy now raised in this case as either legitimate or reasonable. Therefore, this Court holds that this defendant, who was not an overnight guest, does not have an expectation of privacy sufficient to permit him to challenge an illegal search under the Fourth Amendment.[7] Therefore, the motion to suppress is DENIED.

---

5. Webster's Third New International Dictionary 1096 (1981) defines "houseguest" as "a guest staying overnight or longer."

6. This conclusion is particularly necessitated by the discussion by the majority in *Rakas* relative to the concern that guests surely would not be able to assert an expectation of privacy in the entirety of a dwelling, such as, for example, the basement, when they had neither been into nor seen that part of the premises. Inasmuch as the *Olson* decision makes no reference whatsoever to these concerns raised in *Rakas,* this Court is loathe to read *Olson* as extending beyond its precise holding.

7. Of course, the defendant may challenge the search of himself and his personal belongings.

*Rakas v. Illinois,* 439 U.S. at 142, 99 S.Ct. at 430 n. 11. In this case the informant's tip and Inspector Hartman's belief that the defendant was about draw his gun constituted reasonable suspicion sufficient to support the *Terry* stop and frisk of the defendant. Once the gun was found, the police were authorized to arrest the defendant and perform a *Chimel* search of the blue bag because it was within reach of the defendant and from it he might have obtained either a weapon or something that could have been used as evidence against him. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

Because the Court holds that the defendant may not challenge the search of Ms. Ward's apartment, it need not determine whether the officers had probable cause to believe that a crime was being committed in the apartment or that exigent circumstances existed. That being so, the Court DENIES defendant's motion to disclose the identity of the government's confidential informant. Furthermore, because the superseding indictment merely adds the schoolyard specification, 21 U.S.C. § 845a, to the original indictment, the Court DENIES defendant's motion for a bill of particulars for the same reasons that it denied the defendant's motion in its order of February 6, 1990.

IT IS SO ORDERED.

## ORDER

This matter having come on for consideration on the motions of the defendant to suppress evidence seized during the arrest of the defendant, for disclosure of the identity of the government's confidential informant, and for a bill of particulars, and the responses thereto, and a decision having been rendered in the attached Memorandum of Opinion, it is hereby ORDERED that, for the reasons stated therein, the defendant's motions are DENIED.

IT IS SO ORDERED.