Michael P. HANNA, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: July 20, 1990.
Decided: March 14, 1991.
Rehearing Denied May 21, 1991.

Benjamin Shaw, III, Georgetown, and Ellis S. Rubin (argued), Rubin, Rubin & Fuqua, Miami, Fla., for appellant.

Gary A. Myers, Deputy Atty. Gen., Dept. of Justice, Georgetown, for appellee.

Before CHRISTIE, C.J., MOORE, J., and HARTNETT, Vice Chancellor (sitting in designation pursuant to Del. Const. art. IV, § 12).

CHRISTIE, Chief Justice:

The appellant, Michael P. Hanna, was convicted in the Superior Court, in and for Kent County, of one count each of criminally negligent homicide, 11 *Del.C.* § 631, conspiracy in the third degree, 11 *Del.C.* § 511, burglary in the third degree, 11 *Del.C.* § 824, and theft, 11 *Del.C.* § 841. On appeal, Hanna raises three contentions. First, he contends that the Superior Court should have granted his motion to suppress certain items of physical evidence found at his codefendant's trailer on the basis that, as a casual, overnight visitor, he had a reasonable expectation of privacy in the premises and has standing to challenge the legality of the search. Second, Hanna claims that the Superior Court should have suppressed a statement he made shortly after his initial, unlawful arrest as a "fruit of the poisonous tree." Finally, Hanna contends that the Superior Court erred in admitting testimony regarding a burglary which the victim had accused Hanna of committing one week prior to the homicide. We find that the Superior Court erred in its finding that Hanna lacked standing to challenge the legality of the search of the residence at which he was an overnight guest. We find no merit to appellant's second and third contentions, and we agree with those portions of the Superior Court ruling to which they pertain. Therefore, we reverse Hanna's convictions based upon the erroneous ruling of the Superior Court refusing to consider Hanna's motion to suppress the evidence found at the trailer, *State v. Hanna*, Del.Super., 542 A.2d 794 (1988), and remand the case for proceedings consistent with this opinion.

## I.

A statement of the facts relevant to the crime and its investigation is contained in the Superior Court opinion granting in part and denying in part Hanna's motion to suppress. *State v. Hanna*, Del.Super., 542 A.2d 794 (1988). A brief summary of the facts most relevant to our holding follows.

At approximately 6:30 a.m. on March 6, 1987, the body of Robert Schurman was discovered inside the Family Game Room, a video arcade located in Milford, Delaware. Schurman, the manager of the arcade on duty the previous evening, had been beaten to death.

The Milford police noticed sneaker prints and tire tracks behind the arcade. At approximately 10:30 a.m. that day, a co-worker of the victim informed police that the victim had suspected that the appellant committed a burglary of the Family Game Room one week previously. The co-worker supplied the police with several names of patrons of the arcade who had verbal confrontations or other problems with the victim prior to his death. This list of names included those of appellant and his codefendant, Charles Craft. A truck driver informed police that he had seen a white vehicle parked near the arcade at approximately 2:30 a.m. on March 6. The police learned that Charles Craft drove a white vehicle. They decided to locate Hanna and Craft for questioning.

At approximately 2 p.m., on March 6, several Milford police officers and a Delaware state police officer went to Craft's residence, a trailer which belonged to Tawn Beard. Craft had resided there for several months, and acquaintances of both Hanna and Craft informed the police that Hanna often stayed in that trailer. The officers observed sneaker prints and tire tracks outside the trailer which they thought were similar to those found outside the arcade. The officers asked a neighbor, who happened to be related to the owner of the trailer, to look inside the trailer. The neighbor complied and told the officers that no one was inside. The police then decided to return to Milford to question another suspect. They stationed two officers in the lane leading to the trailer, to preserve the sneaker prints and tire tracks, and to wait for Hanna or Craft to arrive. The officers were instructed to prevent Hanna and Craft from entering the trailer and to hold them for questioning.

Hanna and Craft arrived at the trailer at approximately 3:30 p.m. The officers stopped their car and ordered Hanna and Craft out of the car at gunpoint. They searched both occupants, placed them in handcuffs, and informed them that they were being held for questioning by detectives regarding a homicide. When the detectives arrived shortly thereafter, they removed the handcuffs from Hanna and Craft and informed them that a mistake had been made. They gave *Miranda* warnings to Hanna and Craft and asked them to accompany the police to the Milford Police Station for questioning. The police transported them in separate cars to the police station and placed them in holding cells.

During the ride to the station, Hanna, whom the police knew was a juvenile, informed the police that he wished to contact his mother. At the police station, he attempted to reach her by telephone, but was unsuccessful. Craft gave his first statement at 4:21 p.m. Hanna was given *Miranda* warnings a second time, then was questioned and gave a statement at 4:44

p.m. In their first statements, both Hanna and Craft denied any involvement in the death of Robert Schurman, stating that they had been at the Game Room the previous evening but left before closing and had spent the night at Craft's residence. Although Hanna maintained his primary residence with his mother in Milford, he frequently spent the night with Craft at the trailer. The police noted inconsistencies in Hanna's and Craft's explanations for cash found in their possession and continued to question them separately. At approximately 5:30 p.m., Hanna again tried to contact his mother and left a message for her on her answering machine that he was at the police station.

Hanna's mother, Jean Ward, arrived at the police station at approximately 7 p.m. and was permitted to speak with her son around 7:30 p.m. She told Hanna she would take him home, but he explained that he could not leave because the police had taken his sneakers. Approximately one hour earlier, an officer had observed what appeared to be specks of dried blood on the shoes and asked Hanna to remove them. The police now informed Ms. Ward that she could not have her son's sneakers because they were being held as evidence and that she could not take her son home. A Milford police lieutenant then ordered Ms. Ward from the building. Ms. Ward told Hanna not to speak to the police and that she was going home to call an attorney. Ms. Ward told the police they had no right to speak to her son or to hold him.

When Ms. Ward returned home at approximately 8:30 p.m., she was prevented from entering her home by police officers who told her that she could not enter because they had obtained a search warrant. In fact, no search warrant had yet been obtained. The search warrant application was not received by the issuing court until 9:41 p.m. Ms. Ward persisted in her efforts to enter her home to call an attorney. At 8:43 p.m., she was arrested for disorderly conduct and returned to the Milford Police Station in handcuffs.[1] Ms. Ward was

---

**1.** It is not clear from the record whether Hanna had contact with his mother upon her arrival to the police station. One officer testified:

eventually released after being processed, and she continued her efforts to contact an attorney but was unable to do so.

At 9:05 p.m., Craft gave his second statement to the police which incriminated Hanna. The police then formally placed Hanna under arrest for murder in the first degree. Meanwhile, the police obtained nighttime search warrants for the Hanna residence in Milford and the Craft residence, the trailer near Harrington. Officers executed the warrants at 11:23 p.m. at the Hanna residence and at 11:53 p.m. at the Craft residence and seized various items of physical evidence.

At 3:30 a.m. on March 7, a Milford police officer woke Hanna in his cell to fingerprint and process him for his court appearance. Hanna immediately asked if his mother or an attorney had come to the police station. After being told that no one had come, Hanna stated that he wanted to talk to someone. He was again given *Miranda* warnings. Hanna asked the police several questions such as, "Well, I can't have an attorney now, right?" and "Well, when would it be best to hear this, 'til I get an attorney, right?" At 3:45 a.m., Hanna gave a statement implicating both himself and Craft in the burglary of the Game Room and indicating that Craft was responsible for the victim's death. At 4:05 a.m., Hanna gave a third statement incriminating himself in the death. Hanna was finally presented to a justice of the peace at approximately 5 a.m., more than thirteen hours after he was first taken into custody.

### II.

At trial, Hanna moved to suppress as evidence the three statements he made to police, his fingerprints and the analysis of the prints, his sneakers, and various items of physical evidence seized pursuant to the nighttime search warrants at his Milford residence and at the Craft residence. The

Superior Court suppressed the two incriminating statements given at 3:45 and 4:05 a.m. on March 7 because the police had failed to comply with the requirement of 10 *Del.C.* § 933 that a juvenile charged with a crime be taken "directly" before a court. The court admitted the first statement (his denial of involvement in the crime) which he gave at 4:44 p.m. on March 6, ruling that although the initial detention of Hanna was unlawful,[2] the chain of causation between the illegal arrest and the statement was broken when the police removed the handcuffs and asked Hanna and Craft to come to the police station for further questioning. The court also admitted the fingerprints and the police analysis of the prints, ruling that their causal connection to the initial unlawful arrest was broken by two intervening events, the release of Hanna after the initial detention and Craft's 9:05 statement which provided probable cause to arrest Hanna and take his fingerprints. The Superior Court admitted Hanna's sneakers into evidence, ruling that Hanna had consented to their seizure and that even if he had not consented the sneakers would have been inevitably discovered and thus were exempt from the exclusionary rule. *Cook v. State*, Del. Supr., 374 A.2d 264, 267–68 (1977).

The Superior Court granted Hanna's motion to suppress physical evidence seized at his residence, ruling that the nighttime search warrant affidavit was deficient under 11 *Del.C.* § 2308 for its failure to specify the necessity for a nighttime search and that the evidence seized there must be suppressed under *Mason v. State*, Del.Supr., 534 A.2d 242 (1987). Although the affidavit accompanying the application for the Craft residence nighttime search warrant was similarly deficient under 11 *Del.C.* § 2308, the Superior Court ruled that Hanna, as a casual overnight visitor or guest, had no reasonable expectation of privacy in

Q: Do you know whether or not Michael Hanna saw his mother in handcuffs?
A: No, I do not know that.
Q: Was there any effort to make sure that that did not happen?
A: I don't know.
Q: Can you say no, there was not?

A: Not on my part.
Transcript at B–141.

**2.** Neither side has contended that the initial detention and handcuffing at the Craft trailer was supported by probable cause.

the premises of the trailer and therefore lacked standing to challenge the search. It is this ruling which we reverse today, following the guidance of the United States Supreme Court in *Minnesota v. Olson*, —— U.S. ——, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).

### III.

■ When ruling upon a motion to suppress evidence, a court must engage in a two-prong inquiry. First, the court must determine whether the movant has a right to contest the search or seizure. If he does not, the inquiry ends, and the evidence will not be suppressed. Only when the movant has standing must the court assess the validity of the police conduct.

■ We note at the outset that the claimed illegality of the search in this case derives from a Delaware statute, 11 *Del.C.* § 2308, which independently furnishes a basis for protecting personal rights even when the federal constitution does not provide the same level of protection. The United States and Delaware Constitutions protect the right of persons to be secure in their homes against "unreasonable searches and seizures." U.S. Const. amend. IV; Del. Const. art. I, § 6. Searches and seizures are per se unreasonable, in the absence of exigent circumstances, unless authorized by a warrant supported by probable cause. *State v. Poli*, Del.Supr., 390 A.2d 415, 418 (1978); *Schramm v. State*, Del.Supr., 366 A.2d 1185, 1189 (1976). The Delaware Code grants even greater protection against the nighttime search or seizure within a residence. Even when a search is supported by probable cause and a warrant has been obtained, the search may not be conducted at night absent a showing of exigent circumstances which make it necessary to conduct the search at night. Since 1852, a Delaware statute has required that a nighttime search or seizure in a residence, even when a warrant has been obtained, be justified in this manner.[3] Currently, the relevant statute provides:

A search warrant shall not authorize the person executing it to search any dwelling house in the nighttime unless the judge, justice of the peace or magistrate is satisfied that it is necessary in order to prevent the escape or removal of the person or thing to be searched for, and then the authority shall be expressly given in the warrant. For purposes of this section the term "nighttime" shall mean the period of time between 10:00 p.m. and 6:00 a.m.

11 *Del.C.* § 2308. The Court will apply a "four-corners" test to an affidavit attached to a nighttime search warrant to determine whether sufficient facts existed to justify the issuance of the warrant. *Henry v. State*, Del.Supr., 373 A.2d 575, 577 (1977); *Jensen v. State*, Del.Supr., 482 A.2d 105, 110–111 (1984).

The purpose of these constitutional and statutory provisions is to protect individuals' places of residence from unreasonable intrusions. In Delaware, therefore, an unreasonable nighttime search can derive not only from a lack of probable cause or lack of a warrant, but also from a failure to comply with the special requirements of 11 *Del.C.* § 2308 for a nighttime search. If the search fails to meet any part of the test, the evidence obtained will be excluded from use at trial. *Mason v. State*, Del. Supr., 534 A.2d 242, 252 (1987).

■ The law uses the term "standing" to define the class of persons entitled to challenge the legality of a search or seizure and to demand the suppression of evidence seized under the exclusionary rule.[4] Stand-

---

**3.** A Delaware statute enacted in 1852 provided: A search warrant shall not authorize the person executing it to search any dwelling-house in the night time, unless the magistrate, or justice, shall be satisfied that it is necessary in order to prevent the escape, or removal, of the *person*, or things, to be searched for; and then the authority shall be expressly given in the warrant.

*Del.Rev.Stat.*, ch. 97, § 29 (1852). *See also* 11 *Del.C.* § 2308 (1979 & Cum.Supp.1986) and its antecedents, *e.g.*, 11 *Del.C.* § 2308 (1953); *Del. Rev.C.*, ch. 119, § 38 (1935); *Del.Rev.Stat.*, ch. 97, § 29 (1893).

**4.** In recent years, the United States Supreme Court has technically rejected the use of the term in Fourth Amendment cases. In *Rakas v.*

ing, therefore, determines access to the exclusive remedy provided for illegal searches or seizures. Standing "depends not upon a property right in the invaded place but upon whether the person ... has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). A subjectively held expectation of privacy is legitimate if it is "one that society is prepared to recognize as 'reasonable.'" *Rakas* at 143–144 n. 12, 99 S.Ct. at 430 n. 12, 58 L.Ed.2d 387 *quoting Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). The United States Supreme Court established in the *Rakas* opinion the "unremarkable proposition" that a person may have a sufficient interest or legitimate expectation of privacy in a place other than his home to justify protection from unreasonable governmenal intrusion. *Rakas*, 439 U.S. at 142, 99 S.Ct. at 430, 58 L.Ed.2d 387.

■ In this case, the Superior Court stated: "[i]n determining whether one has a legitimate expectation of privacy, the Court must consider the 'totality of circumstances.' *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). Under the totality of these circumstances, I find Hanna was a mere casual visitor or a guest at the trailer. As a casual visitor or guest at the trailer, Hanna had no legitimate expectation of privacy there." *Han-na*, 542 A.2d at 802. The Court listed the factors underlying its finding:

(a) Hanna did not possess a key to the trailer; (b) the trailer was usually kept unlocked; (c) Hanna had no right to exclude others from the trailer; (d) Hanna did not receive any mail at the trailer; (e) Hanna did not keep his wardrobe at the trailer, (f) although Hanna slept overnight at the trailer occasionally, he usually did so on a weekend night; (g) when he slept there, Hanna usually slept on a couch; and (h) Hanna slept at the trailer only in Craft's presence.

*Hanna*, 542 A.2d at 802.

These factors are similar to those used in a test which the United States Supreme Court has recently labeled "needlessly complex" in *Minnesota v. Olson*, — U.S. —, 110 S.Ct. 1684, 1688, 109 L.Ed.2d 85 (1990), issued two years after the Superior Court's ruling on Hanna's suppression motion.[5] In *Olson*, a suspect in a robbery-murder spent the night of the crime on the floor of a home with the residents' permission. Olson kept a change of clothes at the home, but did not have a key. On the day following the crime, police officers forcibly entered the home, found Olson hiding in a closet, and arrested him. At trial, Olson sought suppression of statements he made shortly after his arrest and was denied a hearing on the issue because he lacked standing to contest the legality of the en-

*Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Court indicated that standing should not be the subject of a separate inquiry; instead, a sentencing court should decide "the substantive question of whether the challenged search or seizure violated the Fourth Amendment rights of that particular defendant." 439 U.S. at 138, 99 S.Ct. at 428, 58 L.Ed.2d 387.

5. A Minnesota trial court looked at twelve factors to determine whether a dwelling was the "home" of the defendant, mistakenly requiring that a place must be one's "home" in order for a person to have a legitimate expectation of privacy there. *See Olson*, 110 S.Ct. at 1687–1688 nn. 4 and 5. The factors were:

(1) the visitor has some property rights in the dwelling;

(2) the visitor is related by blood or marriage to the owner or lessor of the dwelling;

(3) the visitor receives mail at the dwelling or has his name on the door;

(4) the visitor has a key to the dwelling;

(5) the visitor maintains regular or continuous presence in the dwelling, especially sleeping there regularly;

(6) the visitor contributes to the upkeep of the dwelling, either monetarily or otherwise;

(7) the visitor has been present at the dwelling for a substantial length of time prior to the arrest;

(8) the visitor stores his clothes or other possessions in the dwelling;

(9) the visitor has been granted by the owner exclusive use of a particular area of the dwelling;

(10) the visitor has the right to exclude other persons from the dwelling;

(11) the visitor is allowed to remain in the dwelling when the owner is absent;

(12) the visitor has taken precautions to develop and maintain his privacy in the dwelling.

try. The Supreme Court held "that Olson's status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Olson,* 110 S.Ct. at 1688. The Court reasoned:

> From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend. Society expects at least as much privacy in these places as in a telephone booth—"a temporarily private place whose momentary occupants' expectations of freedom from intrusion are recognized as reasonable," *Katz,* 389 U.S. at 361, 88 S.Ct. at 517 (Harlan, J., concurring).
>
> That the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy.... the point is that hosts will more likely than not respect the privacy interests of their guests, who are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises and do not have the legal authority to determine who may or may not enter the household.

*Olson,* 110 S.Ct. at 1689.

We adopt the *Olson* standing provisions in the context of both constitutional violations and statutory violations for which an exclusionary remedy exists. Therefore, we hold that Hanna's status as an overnight guest at the Craft trailer gave him a legitimate expectation of privacy in the premises. *See, e.g., State v. Carter,* 22 Conn.App. 118, 576 A.2d 572 (1990) (boyfriend of apartment owner who stayed overnight had standing under *Olson* ); *cf. Commonwealth v. Ferretti,* 395 Pa.Super. 629, 577

A.2d 1375 (1990) (*Olson* not applicable because defendant not overnight guest); *United States v. McNeal,* 735 F.Supp. 738 (N.D.Ohio 1990) (defendant was transient, not overnight guest; *Olson* not applied). Because Hanna had a reasonable expectation of privacy in the Craft trailer, we rule that he had a right to claim the protection of the exclusionary remedy which Delaware law provides for violations of 11 *Del.C.* § 2308.

■ We do not find persuasive the State's contention that because Hanna was not present at the trailer when the search took place, he is not entitled to contest the search and invoke the protection which the Delaware statute affords. The *Olson* decision did not explicitly address whether an overnight guest not present during the search would have standing, because the defendant in that case was in fact present. However, we do not find the distinction meaningful because the central concern in both the constitutional and statutory contexts is the protection of the sanctity of the place of residence against unlawful invasion. *See Payton v. New York,* 445 U.S. 573, 585, 100 S.Ct. 1371, 1379–80, 63 L.Ed.2d 639 (1980) ("physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed"). To hold otherwise would permit, and perhaps encourage, the police to adopt a strategy of waiting for residents to leave and entering their vacant homes without a proper warrant. We note that in this case, both the Hanna and Craft residences were likely to be empty because of the arrest of the residents.

We conclude that the Superior Court erred as a matter of law in its finding that Hanna lacked standing and in its failure to consider his claim that the search warrant affidavit was inadequate under 11 *Del.C.* § 2308. Because the Superior Court failed to reach the merits of Hanna's claim that the search warrant was in fact deficient, we do not address it here, but we note that Superior Court did rule that a corresponding warrant for a search of Hanna's usual residence was deficient.

## IV.

◼ Hanna's second contention is that the Superior Court should have suppressed his first statement to police, given at 4:44 p.m. on March 6, 1987 at the Milford Police Station because of his initial unlawful seizure outside the Craft trailer. The Superior Court found that this seizure and detention was not supported by probable cause or by recognized exceptions to the probable cause requirements. *Hanna*, 542 A.2d at 800. Despite the impropriety of the police conduct, however, the Superior Court held that when the police removed the handcuffs and Hanna and Craft voluntarily agreed to be interviewed at the police station, the causal connection between the unlawful seizure and Hanna's subsequent statement was broken.

We find no error in the Superior Court's reasoning on this point. Hanna voluntarily agreed to go to the police station for questioning and to give a statement. *Fullman v. State*, Del.Supr., 389 A.2d 1292, 1297 (1978); *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973) (voluntariness of statement is a question of fact to be determined from the totality of the circumstances). The previous unlawful detention did not prevent Hanna from voluntarily agreeing, "in a spirit of apparent cooperation," to do so. *United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980) (quoting *Sibron v. New York*, 392 U.S. 40, 63, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968)). In light of the intervening circumstances of Hanna's release and his voluntary travel to the police station for questioning, the connection between his initial, unlawful seizure and his statement became so attenuated as to dissipate the taint. *See Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975).

## V.

◼ Finally, Hanna contends that testimony about a theft committed at the Game Room one week prior to Robert Schurman's death should not have been admitted at trial. In one of his pretrial statements, Hanna's codefendant, Craft, stated that Hanna had told him that on a previous occasion he had taken some coins from the Game Room. Hanna submitted a motion *in limine* seeking exclusion of that portion of the statement and any testimony regarding the prior theft. In a hearing outside the presence of the jury, the Superior Court determined that the evidence was admissible under D.R.E. 404(b) [6] to prove identity and that, in view of the limiting instruction it would give, the probative value of the evidence was not substantially outweighed by the danger of prejudice to the defendant.

This Court addressed the guidelines to be used in determining the admissibility of prior crimes under D.R.E. 404(b) in *Getz v. State*, Del.Supr., 538 A.2d 726, 734 (1988). The Superior Court followed these guidelines, finding that the evidence was introduced to prove identity, which was an ultimate fact in dispute, that the prior crime was proven by "plain, clear, and conclusive" evidence and was not too remote in time from the charged offense. Additionally, the court found that its probative value was not outweighed by its prejudicial effect under D.R.E. 403, and the court gave a proper limiting instruction regarding the use of the evidence. We find no error in the admission of the evidence concerning the prior theft from the Game Room.

## VI.

We REVERSE the convictions because the trial court erred in refusing to consider Hanna's motion to suppress the evidence obtained during the search of the Craft trailer, and we REMAND the case for proceedings consistent with this opinion. We

---

**6.** D.R.E. 404(b) provides:

*Other Crimes, Wrongs Or Acts.* Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

find no error in the ruling of the trial court admitting into evidence Hanna's first statement to the police and the testimony regarding the prior theft.