**STATE of Delaware**

v.

**Wilbert HARRIS, Defendant.**

Superior Court of Delaware,
New Castle County.

Submitted: Sept. 27, 1993.
Decided: Oct. 4, 1993.

---

Cynthia R. Kelsey, Deputy Atty. Gen., Wilmington, for State.

Joseph A. Hurley, Wilmington, for defendant.

## *OPINION*

BARRON, Judge.

Defendant, Wilbert Harris, was charged by Grand Jury indictment with Trafficking in cocaine and with Possession with intent to deliver cocaine. These offenses allegedly occurred on or about September 25, 1991, in New Castle County. The defendant moved to suppress as evidence the cocaine which was seized by the police from a bedroom located in his mother's house at 1127 East 22nd Street in the City of Wilmington. The bedroom was occasionally occupied by the defendant. A hearing on the motion was held before the Court on August 10 and 11, 1993. The Court thereafter received briefs submitted by the parties which set forth their respective positions on the issues to be decided.

This case involves the consent of a third party for police to search premises and effects within the premises for contraband. The State maintains that the defendant's mother, Deborah Harris, consented to the search which resulted in the discovery of the

illegal drugs and that she possessed at least apparent authority to have so consented. The defendant contends that his mother did not give her consent to the search and that, if she did, she was not authorized to have done so.

## FACTUAL BACKGROUND

On September 20, 1991, an attempted murder by firearm was allegedly committed by Gregory Jones. The victim told the police that the defendant, a good friend of Jones, was present at the time of the shooting. During the next several days, the police executed four separate search warrants for four separate residences in their attempt to locate Jones. During one such search which took place on September 25, 1991, the police obtained information that the defendant and/or Jones might be found at Deborah Harris' residence. Several officers proceeded to 1127 East 22nd Street. They did not have a search warrant.

Officer Burns, Detective DiSabatino and Detective Merrill went to the front door and knocked on the door. Other uniformed officers went to the rear of the residence. Wilbert Chapman, the defendant's father, answered. He was visiting his son and had arrived from South Carolina the previous weekend. The police asked Chapman if "Cooter," the nickname given to the defendant, or Jones was there. Chapman told the police that neither gentleman was in the residence.

Although there was conflicting testimony as to the subsequent events, the Court believes that the following account derived from the testimony presented at the suppression hearing most accurately reflects the sequence of events. The police asked Chapman if they could come in to satisfy themselves that neither Jones nor the defendant was there. Chapman said, "Go ahead."

Detective Merrill produced a consent to search form, and he asked Chapman to sign it. Chapman momentarily demurred, stating that it was not his house. The police mentioned the possibility of obtaining a search warrant and so convinced Chapman to sign the form. He then did so without reading it.[1] During this time, and after the police had undertaken a cursory search of the premises,[2] Frances Harper, the defendant's teenage cousin who had observed numerous police at the Harris' residence, came by in order to ascertain what was happening. Chapman told her he was glad to see her and to please call "Boo Boo," the nickname of Deborah Harris. When Harper went to do so, she learned that Harris had already left her place of employment.[3]

Shortly thereafter, Harris appeared at her home. By this time, the police had ascertained that a bedroom on the second floor was locked. Det. Merrill asked if Harris had a key to that bedroom. She said she did.[4] She was asked if she would unlock that door. She said she would. She went up and un-

---

1. The fact that a search warrant was mentioned "does not necessarily constitute a coercive factor negating consent." *United States v. Hummer*, 916 F.2d 186, 190 (4th Cir.1990).

2. Mr. Chapman, at the very least, had apparent authority to consent to such a search. *See Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). In any event, since no evidence was located as a result of the cursory search, Mr. Chapman's participation and involvement with the police is simply provided as background and to set the scene for what followed. Clearly, since no evidence was found as a result of the initial cursory search, the "fruit of the poisonous tree" doctrine as enunciated in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) is not implicated.

3. It is likely that one of the officers was directed by Det. Merrill to go to Ms. Harris' workplace,

just a couple of blocks away and tell her that her presence was requested at her house.

4. Ms. Harris explained at the hearing that the room was Cooter's room and that he had installed the lock approximately one and one-half years prior to September 25, 1991, so as to afford him "privacy." She explained that she had a key so she could change the bed sheets and do his laundry. She said he stayed overnight approximately one or two days per month. There is no contention that the defendant lacks standing to contest the search and seizure of evidence found in the bedroom which he occasionally occupied since his status gave him a legitimate expectation of privacy in the premises. *See Hanna v. State*, Del.Supr., 591 A.2d 158 (1991). In fact, the State, in its September 13, 1993, responding brief, concedes as much.

locked the door. The police entered the bedroom. Neither Jones nor the defendant was in the bedroom.

In the course of searching the bedroom for Jones and the defendant, the police noticed two items of interest, an empty plastic gun box on top of a television and a locked red toolbox on the floor. An officer picked up the toolbox, shook it and either he or another officer opined that it sounded like a gun.[5] The police asked Harris if she had a key to the toolbox. She said she did not. Harris explained that when she cleaned the bedroom the day before she had not noticed the toolbox. The police asked for her consent for them to open the toolbox. Her answer is important to this case, although not dispositive of the outcome. Therefore, the recollections of all testifying witnesses with relevant knowledge are set forth below:

Det. Merrill testified that Harris stated, "Do what you have to do. I don't want any guns in my house."

Wilbert Chapman was standing on the stairs leading to the bedroom. He testified that a police officer jiggled the toolbox, then stated that there could be a gun in the box and asked Harris if he could open it. Harris looked at Chapman. He shrugged his shoulders at her. She shrugged her shoulders at him. He testified that Harris never said anything in response to the officer's question.

Frances Harper was also standing on the stairs leading up to the bedroom at that time. She testified that after the police asked Ms. Harris if they could open the toolbox, she shrugged her shoulders but did not reply.

Deborah Harris testified that after being asked if the police could open the toolbox, she shrugged her shoulders, palms up, as if to say, "I don't know."

Det. DiSabatino had testified as a State's witness that Harris had given her permission to open the toolbox. He was recalled as a defense witness and testified that he could

not remember her exact words. He recalled that *she made a gesture.* The police then pried open the box with a screwdriver, finding inside cocaine, ammunition and a large amount of money. The contraband was seized and subsequently the defendant was arrested.

## DISCUSSION

Issues involving third party consent usually involve two sub-issues: first, did the third party consent to the search, and, second, did the third party have authority to consent?

### A. Consent to Search

A warrantless entry into a home for the purpose of conducting a search ordinarily violates the Fourth Amendment. *Payton v. New York,* 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980). However, an exception exists when the search is conducted pursuant to a valid consent. Such a search is constitutionally permissible. *Schneckloth v. Bustamonte,* 412 U.S. 218, 221–22, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). The prosecution has the burden of proving that the consent was, in fact, freely and voluntarily given. *Id.* at 222, 93 S.Ct. at 2045, 36 L.Ed.2d at 860; *Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). A critical question is what must the prosecution prove to demonstrate that the consent was voluntarily given. In *Schneckloth,* the Supreme Court concluded that "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent." *Schneckloth v. Bustamonte,* 412 U.S. at 227, 93 S.Ct. at 2047, 2048, 36 L.Ed.2d at 862, 863. The Court went on to explain:

---

**5.** When the box was pried open, the police found inside several nine mm cartridges, some loose

change, several shotgun shells, the cocaine and U.S. currency.

... [T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For, no matter how subtly the coercion was applied, the resulting "consent" would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed. In the words of the classic admonition in *Boyd v. United States*, 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746: (1886)

> "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."

The problem of reconciling the recognized legitimacy of consent searches with the requirement that they be free from any aspect of official coercion cannot be resolved by an infallible touchstone. To approve such searches without the most careful scrutiny would sanction the possibility of official coercion; to place artificial restrictions upon such searches would

jeopardize their basic validity. Just as was true with confessions, the requirement of a "voluntary" consent reflects a fair accommodation of the constitutional requirements involved. In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents. Those searches that are the product of police coercion can thus be filtered out without undermining the continuing validity of consent searches. In sum, there is no reason for us to depart in the area of consent searches, from the traditional definition of "voluntariness."

*Id.* 412 U.S. at 228, 229; 93 S.Ct. at 2048, 2049, 36 L.Ed.2d at 863, 864.

■ Here, the Court is not concerned with police coercion. While Harris obviously felt somewhat vulnerable over the unexpected police presence at her home on September 25, 1991, there is nothing to suggest coercive police questioning or influence.[6] The Court's concern is more basic: has the State proven by a preponderance of the evidence that Deborah Harris unequivocally consented to the search of the toolbox? I think not.

■ Here, the greater weight of the evidence does not fall on the side of consent. A shrug of the shoulders, palms extended upward, cannot, in this Court's view, be equated with a "Go ahead." Compare *Schneckloth v. Bustamonte, supra*. Rather, such a gesture, which the Court accepts as having occurred in this case,[7] reflects indecision and equivoca-

---

6. Subtle coercion may have been evident from the mere fact that numerous police officers were present in and around her dwelling in diligent search of a violence-prone suspect. However, no intimidation may be inferred from the statements made by the police. While disputed, the Court accepts the police witnesses' assertions that a right to refuse consent was given to Chapman and Harris vis-a-vis the initial search for Jones and the defendant. But even if such right to refuse consent had not been given, the consent to search for the suspects would not be vitiated.

*See United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

7. Even a police witness, Det. DiSabatino, testified that Ms. Harris had made a gesture. Deborah Harris came across as a quiet and withdrawn individual who lacks confidence and assertiveness. An "I don't know" gesture would be very compatible with what I observed in Ms. Harris' bearing.

tion, indicative of neither consent nor refusal.[8] Assuming that Deborah Harris stated "I don't want guns in my house" coupled with a shrug of her shoulders, the Court still concludes that such "consent" was sufficiently ambiguous and equivocal so as to have prompted further police inquiry before searching the toolbox.[9]

## B. Authority to Consent

■ Assuming *arguendo* that Harris consented by implication to the search of the locked red toolbox, the State would still face the insurmountable hurdle of Harris' lack of authority to consent.

Clearly, "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *United States v. Matlock*, 415 U.S. 164, 170, 94 S.Ct. at 988, 993, 39 L.Ed.2d 242, 249 (1974). As the Supreme Court explained in *Matlock*:

> ... The authority which justifies the third party consent does not rest upon the law of property, with its attendant historical and legal refinements, *see Chapman v. United States*, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961) (landlord could not validly consent to the search of a house he had rented to another), *Stoner v. California*, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (night hotel clerk could not validly consent to search of customer's room) but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* at 171 n. 7, 94 S.Ct. at 993 n. 7, 39 L.Ed.2d at 250 n. 7.

Here, although the locked bedroom was used exclusively by the defendant when he opted to occupy these premises, both he and his mother had access to the room. In this sense, then, the authority over the premises was shared. Although the defendant placed the lock on the door to ensure privacy, he gave his mother a key to the lock. Thus, he authorized joint access and control of the room and also assumed the risk that she might permit his bedroom to be searched. The room was, after all, located within his mother's residence. *See DeShields v. State*, Del.Supr., 534 A.2d 630, 634 (1987).

■ Even without mutual access or control, the warrantless entry into the bedroom, which I will assume was based upon Harris' implied consent, would be valid because the police reasonably believed that she possessed common authority over the room when they entered it. *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). As the Supreme Court stated:

> ... [W]hat we hold today does not suggest that law enforcement officers may always accept a person's invitation to enter premises. Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry. As with other factual determinations bearing upon search and seizure, determination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment ... 'warrant a man of reasonable caution in the belief'" that the consenting party had authority over the premises? *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). If not, then

---

8. The State must demonstrate with "clear and positive testimony that consent was 'unequivocal and specific' and 'freely and intelligently' given." *United States v. Abbott*, 546 F.2d 883, 885 (10th Cir.1977) (quoting *Villano v. United States*, 310 F.2d 680, 684 (10th Cir.1962)).

9. Significant is the fact that the police did not request Harris to execute a consent to search form. Had they done so and had Deborah Harris complied, the Court's conclusion on the consent issue may have been different.

warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid.

*Illinois v. Rodriguez,* 497 U.S. at 188, 110 S.Ct. at 2801, 111 L.Ed.2d at 161. *See also United States v. Kinney,* 953 F.2d 863 (4th Cir.1992).

While this analysis justifies the entry into the locked bedroom, the entry into the locked toolbox stands on a different footing.

■ Although Deborah Harris had common authority over the bedroom her son occasionally occupied, she had no common authority over the locked toolbox found in the bedroom. As previously stated, common authority rests "on mutual use of property by persons having joint access or control." *United States v. Matlock,* 415 U.S. at 172 n. 7, 94 S.Ct. at 993 n. 7, 39 L.Ed.2d at 250 n. 7. Here, when asked by Det. Merrill if she had a key to the toolbox, she replied, "No." The lack of joint access or control was self-evident. Significantly, Ms. Harris told the officers that she had not seen the toolbox the day before when she had cleaned the room.

As our Supreme Court stated in *Ledda v. State,* Del.Supr. 564 A.2d 1125 (1989):

> Under the *Matlock* test, third party authority to consent to a search is an essential element of a valid consent. *United States v. Morales,* 3rd Cir., 861 F.2d 396, 399 (1988). Such authority, in turn, must include both possession and equal or greater control, *vis-a-vis* the owner, over the area to be searched.

*Ledda v. State,* 564 A.2d at 1128.

In *Ledda,* the Supreme Court found that the driver of the defendant's vehicle had immediate possession and control over it and, thus, was authorized to consent to a full search of the vehicle. At the same time, our Supreme Court cautioned in a prophetic footnote as follows:

> There is no evidence in the record that [the driver's] control of the vehicle was limited in any way, *such as the lack of a key, or other means of access to the trunk or glove compartment.* We make no finding as to a driver's authority to consent if his control is limited in such a way. *See United States v. Morales,* 861 F.2d at 399 n. 7. (Emphasis added.)

*Ledda v. State,* 564 A.2d at 1128 n. 7.

In the case *sub judice,* Deborah Harris' control of the toolbox was plainly limited— she did not have a key to the lock on it and, thus, had no access to its contents.[10] As the *Ledda* case pointed out, the federal cases in this area require that the third party have authority to consent and that such authority encompasses both authority and control. Here, there is no showing that Deborah Harris had the requisite authority to consent to a search of the locked toolbox which she had not even seen on the previous day. Another analogous case is *State v. Lee,* N.J.App.Div., 245 N.J.Super. 441, 586 A.2d 256, 260 (1991). *See also United States v. Block,* 590 F.2d 535 (4th Cir.1978), where the 23–year–old defendant's mother consented to a search of her son's room and drugs were found in his footlocker. The Fourth Circuit upheld the search of the room but held the search of the footlocker invalid as outside the scope of the consenter's authority to consent because she did not have access to the contents of her son's closed, locked footlocker.

At the time of the search, the police knew that the toolbox was locked, that Deborah Harris did not have a key to it, and that she had not seen the toolbox on the previous day when she was cleaning the bedroom where it was located. They could not, then, reasonably have believed that she possessed common authority over the toolbox when judged against an objective standard, to wit: would the facts available to the police at the moment "warrant a man of reasonable caution in the belief" that the consenting party had

---

**10.** The State cites *Flamer v. State,* Del.Supr., 490 A.2d 104 (1983), where our Supreme Court upheld a warrantless search of the defendant's bedroom based upon the consent of his grandmother. Yet, *Flamer* is clearly distinguishable since there, "the evidence seized was in plain view once entrance was gained...." *Id.* at 117.

authority over the locked toolbox. *Illinois v. Rodriguez*, 497 U.S. at 188, 110 S.Ct. at 2801, 111 L.Ed.2d at 161. As pertains to the toolbox, the answer to the above question, it seems to this Court, must be, "No." In "the absence of sufficient facts, officers have a duty to seek further information in order to determine whether they may reasonably infer that the inviter has the necessary authority to consent" to a search of the premises or effects. *See United States v. Rosario*, 962 F.2d 733, 738 (7th Cir.1992).

■ A protected expectation of privacy may exist where a defendant had taken some special steps to protect his personal effects from the scrutiny of others. *See 2 LaFave, Search and Seizure* at 715 (1978) (citing *United States v. Richardson*, 562 F.2d 476 (7th Cir.1977)); *State v. Douglas*, N.J.App. Div., 204 N.J.Super. 265, 498 A.2d 364, 371 (1985). Here, the defendant, by locking the toolbox and not sharing with others access to that container, took such special steps. This principle has been recognized in other jurisdictions.

In *People v. Egan*, Cal.Ct.App., 250 Cal. App.2d 433, 58 Cal.Rptr. 627 (1967), the California appellate court found that a stepfather's authority to consent to search the defendant's bedroom in the stepfather's apartment did not extend to the defendant's kit bag in the closet where the stepfather denied ownership of the bag. 250 Cal.App.2d at 436, 58 Cal.Rptr. at 630. *See also In re Scott K.*, Cal.Supr., 24 Cal.3d 395, 155 Cal.Rptr. 671, 595 P.2d 105 (1979), *cert. den.* 444 U.S. 973, 100 S.Ct. 468, 62 L.Ed.2d 388 (1975) (warrantless search of toolbox in the defendant's bedroom held inadmissible); *People v. Daniels*, Cal.Dist.Ct., 16 Cal.App.3d 36, 93 Cal. Rptr. 628 (1971) (while mother was authorized to consent to a search of the defen-

dant's bedroom, she had no authority to consent to the search of his suitcase located in the bedroom).

The State cites *United States v. Ibarra*, 948 F.2d 903 (5th Cir.1991) as authority supportive of the police action taken in this case. In *Ibarra*, the Fifth Circuit found that the police conduct of forcibly removing a barrier to an existing passageway leading to an attic was reasonable when the police reasonably understood that area to be within the scope of the consent. The Fifth Circuit was careful, however, in limiting its holding. "Our holding does not extend to the situation in which a locked container—an entity independent of the compartment in question—is found, and opened, during an otherwise permissible search." *Id.* at 907.

The State's reliance on *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) is also misplaced. *Ross* involved a search of an automobile, not a private dwelling.[11] The *Ross* Court stated that:

[T]he guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the Government, as recognizing a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.

*Id.* at 806, 102 S.Ct. at 2163, 72 L.Ed.2d at 582 (quoting *Carroll v. United States*, 267

---

11. The sanctity of the home has been repeatedly recognized by the United States Supreme Court. " 'The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the

ruined tenement.' " *Miller v. United States*, 357 U.S. 301, 307, 78 S.Ct. 1190, 1195, 2 L.Ed.2d 1332, 1337 (1958) (quoting remarks attributed to William Pitt). *See also Payton v. New York*, 445 U.S. 573, 601 n. 54, 100 S.Ct. 1371, 1388 n. 54, 63 L.Ed.2d 639, 660 n. 54 (1980); *United States v. Ross*, 456 U.S. at 822 n. 31, 102 S.Ct. at 2171 n. 31, 72 L.Ed.2d at 592 n. 31.

U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925)).[12]

Nevertheless, the State cites the following portion of *Ross* as supportive of the action taken by the police with regard to the locked toolbox:

A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, *a warrant that authorizes an officer to search a home* for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found. *A warrant to open a footlocker to search for marihuana* would also authorize the opening of packages found inside. A warrant to search a vehicle would support a search of every part of the vehicle that might contain the object of the search. When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand. (Emphasis added.)

*Id.* 456 U.S. at 820, 821, 102 S.Ct. at 2170, 2171, 72 L.Ed.2d at 591.

The *Ross* passage cited above does not buttress the State's argument since there the Court is plainly referring to the authorized scope of a search conducted pursuant to a court-issued search warrant. Here, the search was conducted without a warrant. "The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amend-

ment—subject only to a few specifically established and well-delineated exceptions.' *Katz v. United States,* 389 U.S. 347, 357 [88 S.Ct. 507, 514, 19 L.Ed.2d 576] (footnotes omitted)." *Id.* 456 U.S. at 825, 102 S.Ct. at 2173, 72 L.Ed.2d at 594. While consent to search provides one such exception, *Schneckloth v. Bustamonte, supra,* the consent exception to the warrant requirement has been clearly delineated as providing that any such consent must be given by a person with actual or apparent authority to do so. *Illinois v. Rodriguez, supra.* Here, Deborah Harris had no authority, actual or apparent, to consent to the search of the locked toolbox. The search was thus unlawful.

**C. The Inevitable Discovery Doctrine**

■ Suppression of the evidence would be uncalled for if it would ultimately or inevitably have been discovered even if no violation of any constitutional provision had taken place. *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *Martin and Massey v. State,* Del.Supr., 433 A.2d 1025 (1981). During the suppression hearing, Det. Merrill suggested the applicability of the inevitable discovery doctrine when he testified that had Deborah Harris not consented to the search, he would have obtained a search warrant for the toolbox and would have, then, discovered the evidence by lawful means.

If the prosecution can establish by a preponderance of the evidence that the evidence—here, the cocaine contained in the toolbox—inevitably would have been discovered by lawful means, then the deterrence rationale behind suppression has so little basis that the evidence should be received. "Exclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial." *Nix v. Williams,* 467 U.S. at 446, 104 S.Ct. at 2510, 81 L.Ed.2d at 389.

"[W]hen ... the evidence in question would inevitably have been discovered

---

**12.** Justice Powell joined the Court's opinion in order to have a ruling in automobile search cases that provides specific guidance to the police and courts. He expressed the view that one's reason-able expectation of privacy is "a limited one" with respect to automobiles. *Id.* at 826, 102 S.Ct. at 2173, 72 L.Ed.2d at 594 (Powell, J., concurring).

without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible."

*Nix v. Williams,* 467 U.S. at 448, 104 S.Ct. at 2511, 81 L.Ed.2d at 390.

[E]vidence, obtained during the course of illegal police conduct, will not be suppressed if the prosecution can prove that the incriminating evidence "would have been discovered through legitimate means in the absence of official misconduct." (Comment, The Inevitable Discovery Exception to the Constitutional Exclusionary Rules, 74 Col.L.Rw. 88, 90 (1974).)

*Cook v. State,* Del.Supr., 374 A.2d 264, 267–68 (1977).

It is one thing to show that the incriminating evidence would have been discovered inevitably by lawful means. It is quite another to say that such evidence *could* have been so discovered. The latter proposition more closely represents Det. Merrill's assertions. In any event, the Court has assumed for purposes of argument that consent was given by Deborah Harris. Suppression of the evidence is required not because of a lack of consent but because Ms. Harris had no authority, actual or apparent, to give such consent.

As our Supreme Court stated in *Cook v. State:*

The instant case is a clear example of the type of situation intended to fall within the purview of the exception. As the commentator has noted:

The majority of the cases employing the inevitable discovery exception involve instances in which the illegal police conduct occurred while an investigation was already in progress and resulted in the discovery of evidence that would have eventually been obtained through routine police investigatory procedure. The illegalities in such cases, therefore, had the effect of simply accelerating the discovery. In general, where the prosecution can show that the standard prevailing investigatory procedure of the law enforcement agency involved would have led to the discovery of the ques-

tioned evidence, the exception will be applied to prevent is suppression.

*Id.* at 268.

Had the State shown by a preponderance of the evidence that police officers were in the process of preparing a search warrant for the location in question at the time the tool-box was opened, a case for the inevitable discovery doctrine would have been made. That is a far cry from the rather self-serving statement that the police would have obtained a search warrant had they not obtained Ms. Harris' consent. The inevitable discovery doctrine has no application to this case.

## CONCLUSION

Because Deborah Harris did not have the authority to consent to the search of the toolbox, and because the police could not have reasonably believed that she had such authority, and because of the inapplicability of the inevitable discovery doctrine to the facts of this case, it follows that the search of the toolbox was not constitutionally sanctioned and that the fruits of that search must be suppressed.

Defendant's Motion to Suppress is GRANTED.

It Is So ORDERED.