*572 OPINION OF THE COURT
Ralph Fabrizio, J.
The main issue in this case is whether the People established that the consent given by the defendant’s mother to search a locked hallway closet in an apartment she shared with the defendant, her adult son, was valid. The defendant is charged with criminal possession of a weapon in the fourth degree (Penal Law § 265.01 [1]), assault in the third degree (Penal Law § 120.00 [1]), and other crimes. The People allege that the defendant knowingly and unlawfully possessed the .380 caliber pistol found during a search of that closet. The defendant has moved to suppress physical evidence found in the closet, as well as evidence of a pretrial identification and a statement. The People called one witness at the suppression hearing, Police Officer Ronnie Guerra, whose testimony is credited to the extent memorialized in the court’s findings of fact. The defendant called his mother, Mabel Snipe, whose testimony the court finds to be almost entirely incredible. The court finds that the People have failed to sustain their burden of establishing that Ms. Snipe had either actual authority or apparent authority to allow the police to search the locked closet, and grants the motion to suppress the physical evidence recovered therein. The motion to suppress identification and statement evidence is denied.
Findings of Fact
On July 27, 2006, at about 7:45 a.m., Police Officer Ronnie Guerra and his partner, Police Officer Miguel Asserato, responded to a 911 call reporting an assault in progress at 165 East 179th Street in Bronx County. A young woman named Miriam McIntosh met the officers in front of that building. As Ms. McIntosh took the officers into the building, she told them that she and her boyfriend, the defendant, had gotten into a fistfight in his apartment, which was number 5J, and that the defendant had smashed her head into a wall, pushed her down on the floor, took her cell phone, broke it, and threw the phone out of the apartment window. The officers asked Ms. McIntosh whether the defendant had any weapons, and she said no.
Ms. McIntosh took the officers upstairs to apartment 5J. The officers knocked several times on the door to that apartment *573 before the defendant, an adult,[1] opened it. Officer Guerra noticed a door to a closet located in the hallway just inside the apartment to the left of the front entrance, and the closet door appeared to be slightly ajar. The officer did not notice any kind of lock or padlock on the outside of the closet door. The officers asked the defendant what had happened, and he said, in substance, that he and Ms. McIntosh “got into it.” Ms. McIntosh explained that she did not want the defendant to be arrested, and Officer Guerra decided to fill out a “domestic incident report” (DIR), rather than place the defendant under arrest.
Ms. McIntosh gathered some personal items from inside the apartment, and then she and the police officers walked down to the street. Officer Guerra began asking Ms. McIntosh to respond to questions listed on the DIR form. One question requests information about whether the subject of the report has access to any weapons. When the officer asked Ms. McIntosh whether she knew if the defendant had such access, she now told him that the defendant “has two guns inside the house.” Ms. McIntosh described the guns as a .380 automatic and a “Tech 9.” She told the officer that the defendant kept the guns inside “the hallway closet, on the top shelf to the left, where he keeps his Timberlands.” Ms. McIntosh also told Officer Guerra that the defendant carried the guns outside the apartment on the street from time to time.
Officer Guerra and his partner immediately proceeded back up to apartment 5J. They knocked on the door several times, but no one responded. Using his police radio, Officer Guerra notified other police officers to search for the defendant and take him into custody. The radio report included the defendant’s physical description. Officer Guerra and his partner returned to apartment 5J, and once again knocked on the door. Finally, the defendant’s mother, Mabel Snipe, opened the front door. Ms. Snipe lives in the apartment with the defendant. Officer Guerra told Ms. Snipe that he had been called to the scene after a report of an incident involving her son and Ms. McIntosh. The officer also told Ms. Snipe, in substance, that her son’s girlfriend had told him that the defendant kept some guns in a hallway closet in the apartment, that he carried those guns around with him from time to time, and that Ms. McIntosh was afraid of the de *574 fendant. Ms. Snipe allowed Officer Guerra and his partner into the apartment.
There was a bathroom directly down the hall from the front door, and the entrance to one bedroom was also visible from that hallway. The kitchen was down the hall to the right, and the living room was down the hall to the left. There appeared to be sheets covering the couch in the living room, and there was a blanket on the floor next to the couch. Officer Guerra was not sure if there were one or two bedrooms in the apartment. The closet door on the left side of the hallway leading directly from the front door into the apartment was now closed. There was also a closed metal swing-latch on the door and a metal hasp. A locked metal padlock was inserted through the hasp, securing the closet door to the frame.
Officer Guerra told Ms. Snipe, in substance, that “it’s very dangerous for your son to be walking the streets with firearms.” He also told her that he believed her son had left the area and that other police officers were looking for him. He then asked Ms. Snipe if she would give him permission to search the closet. Officer Guerra told Ms. Snipe that she was not required to give them permission, but “for your son’s safety, it’s best that we recover” the guns, and that if the guns were “legitimate” her son could always come down to the precinct to “retrieve” them. Neither Officer Guerra nor his partner had their guns drawn at this time. Ms. Snipe told Officer Guerra that he could search the closet. At about this time, Sergeant Cruz and his partner arrived at the apartment. Officer Guerra wrote a statement in his memo book which said, in substance, that Ms. Snipe agreed to allow the officers to search the hallway closet[2] in the apartment, and Ms. Snipe signed the officer’s memo book in the presence of all four police officers.
Officer Guerra then asked Ms. Snipe if she could open the closet for him. Ms. Snipe said no, explaining that “she didn’t have the key, her son has the key” to the padlock. The officer also asked Ms. Snipe if she knew what the defendant kept in the closet, and Ms. Snipe replied “personal stuff.” Officer Guerra did not question Ms. Snipe any further about the lock itself, or about how long ago her son had placed the lock on the door, or whether anyone other than her son used the closet. Of *575 ficer Guerra and his partner then tried to break open the lock using a metal tool that they carried with them. After several minutes, they were unable to break the lock or open the door. Officer Guerra then asked Ms. Snipe if she had any tools they could use, and she retrieved a hammer and a screwdriver from another place in the apartment and gave them to Officer Guerra. Sergeant Cruz used these tools and finally was able to pry the swing latch from the frame, break the padlock, and open the closet door.
Officer Guerra immediately spotted a shoe box with the word “Timberland” emblazoned on it that was on the top shelf on the left side of the closet. The officer opened the box. There was a fully loaded .380 caliber “high point pistol” with one round of ammunition inside the chamber, another fully loaded magazine of ammunition for that gun, and a “mock version of a Mac-10” that looked very much like a real gun, all inside the Timberland box. There was also an identification card with the defendant’s photo inside the box. There were numerous articles of clothing, shoes, and bags in the closet, but the officer said that he could not tell if they would have belonged to a man or a woman because they were not “gender specific.” Officer Guerra testified that Ms. Snipe “seemed surprised” that there had been a gun in the closet.
Meanwhile, the defendant was arrested by other police officers at Jerome and Tremont Avenues. He was driven back to 165 East 179th Street and Officer Guerra identified him outside that building as the person who had been the subject of his earlier radio call. The defendant was taken back to the precinct. After Officer Guerra fingerprinted him, he took him to another room to be “debriefed” by a detective about the firearm. Shortly before 4:58 p.m., a detective entered the room. The detective read the defendant the required Miranda warnings from a form that was introduced into evidence at the hearing. The defendant indicated that he understood each of the warnings read to him, and placed his initials on the form following each warning. The defendant wrote out a statement in his own hand, indicating, in substance, that he had purchased the .380 pistol legally in South Carolina, and had all of the paperwork for the gun in his personal belongings.
Conclusions of Law
The People argue that the physical evidence recovered in the closet should be admissible at trial because (a) the defendant’s *576 mother voluntarily allowed the officers to break off the padlock and search the hallway closet in which the guns and ammunition were recovered; (b) as the defendant’s mother was a cotenant with her adult son in the apartment, she had the actual authority to give consent for the police to conduct the search of the locked closet;[3] and (c) even if the defendant’s mother lacked the actual authority to give consent to search the locked closet, the police had a good faith basis to believe she did because the facts known to them reasonably indicated that she had the apparent authority to consent to the search. The People have a “heavy” burden of establishing the voluntariness of any consent given. (People v Gonzalez, 39 NY2d 122, 128 [1976].) In addition, the People have the burden of establishing by a preponderance of the evidence that the person giving consent had the actual or apparent authority to do so. (People v Gonzalez, 88 NY2d 289, 295 [1996].) They have failed to meet their burden of estabhshing that Ms. Snipe had actual authority to give consent to search the closet, or that, based on the information available to the police, the officers could have reasonably relied on her expression of some apparent authority which would have allowed them to legally search that closet.
At the outset, based on the totality of the circumstances, the People did establish that Ms. Snipe was not coerced in any way into giving the police consent to search the closet. Officer Guerra and his partner spoke with her in a restrained manner, and carefully explained what they wanted to look for, where they wanted to look for it, and why they wanted to have her *577 give them permission to search. The officers also specifically told Ms. Snipe that she did not have to give them consent to search the closet. (See People v Dobson, 285 AD2d 737, 738 [3d Dept 2001].) The officers did not draw weapons as they spoke with Ms. Snipe, or force their way into the apartment in an attempt to obtain the consent. After having all the circumstances explained to her, Ms. Snipe gave both her verbal and written consent to have the officers search the closet. The fact that this consent was voluntarily given is underscored by the fact that Ms. Snipe left the hallway, went to another part of the apartment on her own, and brought the officers the tools which enabled them to break off the lock and open the closet. Under all the circumstances, the People established that Ms. Snipe’s consent was freely and voluntarily given. (See Gonzalez, 39 NY2d at 128-130.)
The more difficult question is whether the People established that Ms. Snipe had the authority, actual or apparent, to give consent to search that locked closet. It is well-settled that a court can find a warrantless search of a premises or a portion thereof to be valid where “permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.” (United States v Matlock, 415 US 164, 171 [1974].) In determining whether a third party has such “common authority,” courts should look to whether the evidence shows
“ ‘mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of [such persons] has the right to permit the inspection in his own right and that others have assumed the risk that one of their number might permit the common area to be searched.’ ” (People v Gonzalez, 88 NY2d at 293, quoting Matlock, 415 US at 171 n 7.)
There is no question that Ms. Snipe is in fact a cotenant with the defendant, her adult son, at the apartment. As such, she had the actual authority to allow the police to enter and search the apartment. (See e.g. People v Cosme, 48 NY2d 286 [1979]; People v Forino, 39 AD3d 664 [2d Dept 2007]; People v Marquez, 302 AD2d 477, 478 [2d Dept 2003].) That actual authority would allow her to give the police consent to search most areas of the apartment she shared with her adult son, including perhaps an unlocked bedroom used by him to which she also had access. *578 (See People v Williams, 278 AD2d 150 [1st Dept 2000]; People v Moorer, 58 AD2d 878, 879 [2d Dept 1977].) As a third-party family member, Ms. Snipe would have actual authority to give consent to search a closet in the apartment that was used by her and other occupants, including her adult son. (See People v Castillo, 131 AD2d 495, 496 [2d Dept 1987]; United States v Robinson, 479 F2d 300, 301-302 [7th Cir 1973].)
However, a third party may not have actual authority to authorize a search of all areas of shared premises. Indeed, there are situations in which such third-party consent “ ‘may not be effective consent to a search of a closed object inside the home.’ ” (Gonzalez, 88 NY2d at 293, quoting United States v Karo, 468 US 705, 725 [1984, O’Connor, J., concurring].) In Cosme (48 NY2d at 293 n 7), the Court held open the question of whether a cotenant has actual authority to consent to a search of a portion of shared premises where one individual “has carved out a specific area for his own exclusive use ... [or where] consent is given by an individual who, as a practical matter, enjoys less than unrestricted access to and control over the premises to be searched.” Other courts that have considered this type of fact situation have found that the person giving consent lacked the actual authority to do so.
For example, one court has recognized that while a third-party parent may have actual authority to consent to allow the police to search an adult child’s unlocked bedroom in a shared residence, that same parent does not have actual authority to consent to search an adult child’s locked trunk located in that bedroom. (See e.g. United States v Block, 590 F2d 535 [4th Cir 1978].) Similarly, it has been recognized that a parent does not possess the actual authority to allow a search of an adult child’s locked toolbox kept inside premises shared by parent and offspring. (State v Harris, 642 A2d 1242 [Del Super 1993].) In fact, in certain situations, a parent may not even have actual authority to allow the police to search a closed but unlocked bedroom used solely by an adult child in the parent’s home, where the police are aware that the child is in fact an adult and there is no indication that the bedroom is used by anyone other than the child. (See People v Russo, 201 AD2d 940, 941 [4th Dept 1994].)
In this case, there is no question that the defendant is an adult, and that the police were aware of that fact at the time of the search. After all, Officer Guerra had met with the defendant at the apartment only a short time before the search took place. And the People introduced no evidence to show that even though *579 the hallway closet was in a common area of the apartment it was in fact being used by anyone other than the defendant at the time the police sought Ms. Snipe’s permission to search that closet. (See United States v Robinson, 479 F2d 300 [evidence showed that both men’s and women’s clothing was present in closet in apartment, supporting conclusion that defendant’s girlfriend had mutual use of closet with him, and therefore had actual authority to consent to the search].) Significantly, there is also a complete lack of evidence to show that Ms. Snipe herself had access to that closet at that time. To the contrary, the evidence introduced by the People only supports the conclusion that the closet was used by the defendant alone, and not by his mother, at the time of the search. The fact that the defendant placed a lock on that door, and did not provide a key for his mother to use to unlock it, gave him a heightened expectation of privacy in that space, because he and he alone had the ability to open the padlock and control access and use of the closet at the time his mother told the police they could search the closet. This bespeaks a complete lack of evidence showing “mutual use” of that closet by the defendant and his mother, as well as a lack of evidence showing “joint access or control for most purposes.” (Gonzalez, 88 NY2d at 293.)
Based on the record in this case, the defendant’s acquiring exclusive control over that closet by use of his own padlock extinguished any actual authority that Ms. Snipe might have had previously to give consent for the police to conduct a warrantless search of the hallway closet simply based on the fact that it was located in a common area of an apartment she shared with her adult son. The fact that the hallway closet they sought her permission to search was secured by a padlock for which the defendant had not given his mother the key certainly showed that the “defendant had taken some special steps to protect his personal effects [stored in that closet] from the scrutiny of others.” (Harris, 642 A2d at 1249 [citations omitted]; cf. Pratt v United States, 214 Fed Appx 532 [6th Cir 2007] [mother had actual authority to consent to allow police to search son’s locked room where son had provided a copy of the key to the mother in the past].) Given these facts, the People have failed to meet their burden of demonstrating that Ms. Snipe had actual authority to give consent to search the locked hallway closet.
Moreover, the People have also failed to demonstrate that the police officers had a good faith basis to believe that Ms. Snipe had authority to consent to their search of the locked closet. In *580 order to rely on the “apparent authority” the People argue existed, this court must evaluate whether there was an objective basis for the police to believe that Ms. Snipe had a legal right to allow them to conduct their search (Gonzalez, 88 NY2d at 295-296.) There are three glaring facts that, viewed objectively, should have given the police reason to doubt that Ms. Snipe had apparent authority to allow the search of the hallway closet. The first fact is that the hallway closet, which the officer observed to be open when he spoke with the defendant in the doorway of the apartment, was closed and padlocked shut after the defendant left. The second fact is that Ms. Snipe told them that she could not open the closet door because she did not have a key to unlock the padlock, and specifically indicated that her son had the key. And the third fact is that when Officer Guerra asked Ms. Snipe if she knew what her son kept in the closet, she replied “personal stuff.” These factors would have caused a “reasonable person to question [Ms. Snipe’s] power or control over” the hallway closet. (People v Adams, 53 NY2d 1, 10 [1981].) Accordingly, at this point it was incumbent upon the police to make further inquiry and establish facts demonstrating that Ms. Snipe had the right to give them consent. (See Illinois v Rodriguez, 497 US 177, 188-189 [1990]; People v Gonzalez, 88 NY2d at 295-297.)
But, as Officer Guerra testified, he did not ask any more questions aimed at fleshing out why Ms. Snipe might have had the authority to give him consent to search the closet. For example, she was never asked if she kept anything in the closet, if she herself had ever opened the closet on her own after the defendant placed the padlock there, if she ever had been given a key by the defendant, or any other questions. Faced with a situation in which Ms. Snipe told the officer that her son, in essence, retained control over access to the hallway closet containing his “personal stuff’ by not giving even his own mother the key to the padlock, Officer Guerra asked her only to provide him with tools to help him break off the padlock and pry open the door. That she did so apparently willingly would not have led a reasonable person to believe that she had the authority to give permission to search the closet, but only that she, too, understood that it would take extraordinary efforts to break into the space. Indeed, the officers expended significant time and effort to go around the security system so obviously installed by the defendant himself to protect his own privacy interest in that particular space. That fact alone would have caused a reason *581 able individual to question Ms. Snipe about whether she, too, only had the ability to access the closet by using tools that would break a lock and damage a doorframe.
The People argue that because the defendant’s girlfriend, Ms. McIntosh, had been able to describe the guns in great detail and pinpoint exactly where they could be found in that closet, the police need not have asked any other questions of Ms. Snipe before relying on her consent to search because it was apparent that people other than the defendant had been in the closet. There is certainly an inference to be drawn in this case that the defendant’s expectation of privacy in the closet as well as in the very box that held the guns was diminished by the fact that others knew that guns were stored in that closet. Indeed, “[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.” (See Katz v United States, 389 US 347, 351 [1967].) Of course, the information relayed by Ms. McIntosh would have more likely than not resulted in the issuance of a warrant to search the closet. But, the fact that Ms. McIntosh had herself apparently seen guns in the Timberland box in that closet does not mean that the police could have reasonably concluded that Ms. Snipe had done so as well, let alone had authority to consent to a warrantless search of the closet, in light of all the other facts that were known to the officer at the time which demonstrated that her son had denied her access to the closet. It is just as reasonable to draw the inference that the defendant allowed access to the closet to certain individuals, and allowed select people, like his girlfriend, to enter it with his permission, but kept the contents of the closet secret from his mother, and completely restricted her access to that closet. The record does not support a finding that the police ever asked Ms. Snipe if she had been in the closet recently, and had seen the gun, before they acted in reliance on her expression of consent. To the contrary, Officer Guerra specifically testified that Ms. Snipe was “surprised” when the police found the gun and ammunition in that closet.
In short, the only thing that should have been reasonably apparent to the police officers at the scene was that this defendant’s parent, Ms. Snipe, lacked any authority to give them permission to search the padlocked closet her adult son used to store his personal belongings in their shared apartment. Without any evidence that Officer Guerra asked any questions that would have “supported a reasonable belief that she also had common authority by way of mutual use, joint access or *582 control over” the locked hallway closet, the People failed to meet their burden of showing that Ms. Snipe had apparent authority to authorize a search of that closet. (People v Gonzalez, 88 NY2d at 296.) Accordingly, the weapon, ammunition, and other physical evidence found in that closet are suppressed.
The other aspects of the defendant’s suppression motion can be dealt with very briefly. The defendant’s motion to suppress the showup identification is denied because there is no evidence that the identification procedure was unduly suggestive. (See People v Wharton, 74 NY2d 921 [1989].) In addition, based on the lengthy conversation Officer Guerra had with the defendant earlier that day prior to the showup, the court finds that he would have an “independent source” to make an in-court identification at trial even if the showup were unduly suggestive. (See People v Smith, 284 AD2d 190, 191 [1st Dept 2001]; Manson v Brathwaite, 432 US 98 [1977].) The motion to suppress the defendant’s postarrest statement is denied as well. The statement was made after the defendant was in custody and had knowingly and voluntarily waived his Miranda warnings, and was not involuntarily made in any manner. (See e.g. People v Cooper, 36 AD3d 828 [2d Dept 2007].) Nor were the identification and statements the result of any illegal arrest. Although the defendant apparently was not arrested until after the gun was recovered, Officer Guerra made his radio transmission requesting that the defendant be picked up before that search, and probable cause existed to arrest the defendant for assault, criminal mischief and other crimes based upon the report made by his girlfriend, Ms. McIntosh, in a face-to-face conversation with Officer Guerra. (See People v Rosario, 24 AD3d 199 [1st Dept 2005].)

. Although there was no direct evidence of the defendant’s actual age introduced at the hearing, the court observed the defendant and he is clearly an adult, well over the age of 21.

. The officer used the word “community closet” during his testimony to describe the closet, but the court does not find that Ms. Snipe herself ever used those words to describe the closet to Officer Guerra, or used any words other than “hallway closet” to describe it.

. The People rely on selected portions of Ms. Snipe’s testimony to advance their arguments that Ms. Snipe had actual authority to allow a search of the closet. Specifically, they cite her testimony that she, in substance, gave her son permission to use that closet as evidence that she maintained actual authority over the closet. As stated earlier, the court does not credit most of Ms. Snipe’s testimony, including that passage. The main reason is that, during the hearing, the court observed and made a record about the defendant’s blatant attempts to “coach” his mother as he sat at the defense table while she testified from the witness stand, and the obvious fact that Ms. Snipe changed at least one of her answers following such “coaching.” In addition, Ms. Snipe specifically testified that she never told Officer Guerra that she would allow him to search the closet, denied that she provided the tools the police used to break off the padlock, and said that she did sign the consent form in the memo book, but only after the gun was found — testimony that the court does not find credible. The only portions of Ms. Snipe’s testimony that the court finds credible are that she lived in apartment 5J with the defendant, her adult son, that her son did not give her a key to the padlock he placed on the hallway closet, and that the police came into her apartment, broke the padlock, and searched that closet.